# In the United States Court of Federal Claims

No. 12-304C
(Filed: February 7, 2013)

* * * * * * * * * * * * * * * * * * * *

SUNDOWNER 102, LLC,

       *Plaintiff*,

v.

THE UNITED STATES,

       *Defendant*.

Breach of Contract; Covenant of Good Faith and Fair Dealing; Option; Extrinsic Evidence

* * * * * * * * * * * * * * * * * * * *

*Richard S. Porter*, Rockford, IL, for plaintiff.

*Stacey K. Grigsby*, United States Department of Justice, Commercial Litigation Branch, Washington, DC, with whom was *Stuart F. Delery*, Assistant Attorney General, for defendant.

## OPINION

BRUGGINK, *Judge.*

Pending in this contract action is defendant's motion to dismiss for failure to state a claim upon which relief may be granted. The matter is fully briefed. We held oral argument on December 5, 2012. For the reasons which follow, we grant the motion to dismiss.

## BACKGROUND[1]

This case involves an indefinite delivery/indefinite quantity, firm-fixed price contract, No. DJJ08-C-1669, to supply eight aircraft for lease to the Justice Prisoner and Alien Transportation System ("JPATS"). On May 6,

---

[1] The facts are drawn from the complaint and attachments to the complaint. For the purpose of ruling on the motion, they are deemed to be true.

2008, the United States Marshals Service ("USMS"), acting through the United States Department of Justice ("DOJ"), awarded the contract to plaintiff Sundowner 102, LLC ("Sundowner"). Plaintiff supplied aircraft for lease to agencies within the JPATS system in order to transport prisoners and detainees. The Department of Homeland Security Immigrations and Customs Enforcement ("ICE") used the JPATS system for operations in Mesa, Arizona and Alexandria, Louisiana. DOJ, USMS, and the Bureau of Prisons used the system for operations in Oklahoma City, Oklahoma.

The contract had a base period of one year with seven option years. Plaintiff argues that the contract required USMS to execute each option year as long as the government "had appropriated funds and a continuing need." Compl. ¶ 43. The government breached the contract, asserts plaintiff, because USMS failed to execute the third, or any of the following option years. Count I of the complaint is a breach of contract claim; Count II is a claim for breach of the covenant of good faith and fair dealing.

*The Contract Language*

The contract is attached to the complaint. At three points, the contract refers to itself as a long-term lease or contract. Standard Form 1449, the first page of the contract states, "This contract is for the long-term lease of jet aircraft . . . ." Compl. Attach. A at 5 (hereinafter "Contract"). Section I, at Part A, "General and Pricing," states that "[u]nder this brand name or equal long-term contract the Contractor shall furnish a standardized aircraft fleet." Contract § I.A.1. Section II, at Part A, "Background," states that the contract is a "long-term aircraft contract [that] will replace short-term (three-year) aircraft leases that are expiring." *Id.* § II.A.4.

Section I of the contract, at Part B, "Term of Contract," sets out a chart[2] "for the period of performance":

---

[2] The chart set out in the text is an accurate recreation of the actual chart in the contract.

| Term | From | To |
|---|---|---|
| Base Period[] | May 6, 2008 | September 30, 2008 |
| Option Year No. 1 | October 1, 2008 | September 30, 2009 |
| Option Year No. 2 | October 1, 2009 | September 30, 2010 |
| Option Year No. 3 | October 1, 2010 | September 30, 2011 |
| Option Year No. 4 | October 1, 2011 | September 30, 2012 |
| Option Year No. 5 | October 1, 2012 | September 30, 2013 |
| Option Year No. 6 | October 1, 2013 | September 30, 2014 |
| Option Year No. 7 | October 1, 2014 | September 30, 2015 |

*Id.* § I.B. Immediately after this table, Section I, Part C appears. It is titled, "Options To Extend." It provides that the government "reserves the right to exercise options to extend the term of the Contract (Section I.C.1 below) and/or to extend the Contract for a period of six (6) months after Option Year 7 during the procurement of a follow-on contract (Section [I.]C.2. below)." *Id.* § I.C. Section I.C.1, *inter alia*, allows the government to extend the term of the contract, at its option, for periods of "one (1) year or fractions thereof," and sets out the procedure for how that option is exercised.

Section II of the contract provides the statement of work. It states the type of aircraft and configurations required, the flight schedules, and inspection processes. Section III governs contract administration and sets out a guaranteed minimum due under the base period of the contract: "The guaranteed minimum for this contract is $2 million during the base period. There is no guaranteed minimum beyond the base period of the contract." *Id.* § III.D.1.

*Modification to the Contract*

Sundowner was to deliver a total of eight aircraft within 17 weeks after the start of the contract, May 6, 2008. This meant that all aircraft would be delivered by the end of the base period, September 30, 2008. *Id.* § II.N.1.3. The amount of aircraft needed by the government, however, soon changed. By August 1, 2008, the government "informed Sundowner that it required only six (6) aircraft." Compl. ¶ 17. The contracting officer sent an email on August 4, confirming that reduction in need. Two days later James Flynn, the manager of Sundowner, sent a reply email, noting that the contract "does not authorize

the Government to unilaterally issue a change." Pl.'s Resp. Ex. A at 7.[3]  He further stated that the government needed "to issue a formal notice of termination for convenience." *Id.* at 8.  The email concluded, however, that "as instructed, Sundowner will cease its efforts to configure the aircraft." *Id.* at 12.  On August 9, 2008, Mr. Flynn proposed a contract modification in order to reduce the number of aircraft for lease. *Id.* at 10-11.

The parties thereafter entered into negotiations concerning how much USMS would pay Sundowner, to modify the contract by reducing the number of aircraft.  The negotiations were on the basis that the only change was to the number of aircraft and the prices for some items, not to the other terms of the contract, which included the option years.

While negotiations were proceeding, on August 31, 2008, USMS notified Sundowner that the government intended to exercise the first option year.  The option extended the term of the contract to September 30, 2009.  The effect was a one-year extension of the agreement for all eight planes.

On February 27, 2009, the parties signed Amendment/Modification No. M0002.  This was a bilateral modification to the contract.  It had the effect of deleting two of the aircraft, adding a one time $7,951,902.24 payment by the government to Sundowner, adjusting prices paid to Sundowner for remaining aircraft, and releasing claims that Sundowner might have arising out of the amendment.  The "Mutual Release Agreement" was the instrument that released claims.  It stated that it was concurrent with the "Mutual Modification (No. M0002) to the Contract," a contract which the release referred to as "the Long Term Lease of Large Jet Aircraft." Compl. Attach. C at 5.

---

[3] The email appears in Exhibit A to plaintiff's response to defendant's motion to dismiss.  The following also appear in this exhibit: an affidavit of the manager of the Sundowner; an email from the contracting officer dated August 6, 2008; a subsequent August 9, 2008 email from Mr. Flynn to the contracting officer; and a December 10, 2010 email from Mr. Flynn that notes Sundowner's intention to submit a contract dispute claim.  Each of these matters are outside the pleadings, and we exclude them from consideration.  Rules 7 and 12(d) of the Rules of the Court of Federal Claims.  As we explain below, even if we were to consider them, however, our resolution of the motion to dismiss would not change.

USMS executed the second option year on September 30, 2009, which extended performance through September 30, 2010. During that option year USMS also executed a delivery order, under a separate Blanket Purchase Agreement ("BPA")[4] that it had with Sundowner, in order to lease two aircraft from October 1, 2010 to September 30, 2011.

USMS did not execute the third option year. Instead, on September 30, 2010, the contracting officer issued a unilateral, one-month extension of the contract until October 31, in order "to allow for contract close-out." Compl. Ex. E at 2.

During work on the BPA delivery order, USMS issued a Request for Proposals "for a new long-term lease to cover operations at the Oklahoma City JPATS site to commence following the duration of the delivery order." Compl. ¶ 31. Plaintiff submitted a proposal and was awarded the contract with a start date of October 1, 2011. Plaintiff currently performs under that new contract.

The complaint asserts that "Defendant or its agents made representations to Sundowner that the Contract would last for the full seven-year period." *Id.* ¶ 60. It further notes that "Sundowner priced its offer to Defendant understanding the Contract to be long-term based on . . . the Contracting Officer's express direction to offerors, in addition to prior dealings between the parties." *Id.* ¶ 51. Plaintiff asserts that, during the negotiations to reduce the amount of aircraft on the contract, "Defendant represented to Sundowner that Defendant intended the Contract to continue throughout the entire duration stated in the Contract, including all extensions." *Id.* ¶ 55.

As noted above, ICE used the JPATS program to support operations in Alexandria, Louisiana and Mesa, Arizona. Following the government decision to not exercise the third option year, the deputy director of JPATS told plaintiff "that ICE left the program and began acquiring its aircraft services by a method other than through USMS or JPATS." Compl. ¶ 62. Plaintiff asserts that "USMS and/or JPATS was charging ICE an excessive amount for aircraft

---

[4]BPAs create "'charge accounts' with qualified sources of supply" between the government and a contractor. Def.'s Mot. to Dismiss 4 n.3 (citing *Zhengxing v. United States*, 71 Fed. Cl. 732 (2006)). An order placed under the BPA becomes a contract with the government. *Id.*

5

charter services that led to ICE backing out of the program with USMS and JPATS." *Id.* ¶ 63. The complaint alleges that, during negotiations for contract modification, "Defendant represented to Sundowner that Defendant had a long-term contract with ICE"; "ICE was bound to the USMS/JPATS program"; and that "ICE's needs and demand for aircraft were substantial and growing." *Id.* ¶¶ 57-59. Plaintiff allegedly suffered because it "reasonably believed that ICE was bound to utilize JPATS services for the duration of the Contract and that Defendant's need was thus substantial, and relied on that belief." *Id.* ¶ 76.

Plaintiff "entered into a contract with a third party" in order to supply its aircraft for the JPATS program. *Id.* ¶ 66. The complaint asserts that the government knew about this contract and the precarious position into which the contract placed plaintiff, *id.*, and "did not further extend the Contract" because it could negotiate a lower price on a new contract. *Id.* ¶¶ 68-69.

On December 10, 2010, Sundowner filed a claim for breach of contract with the contracting officer, pursuant to the Contracts Disputes Act. 41 U.S.C. § 609(a) (2006) *amended by* Pub. L. 111-350, 124 Stat. 3820 (codified at 41 U.S.C. § 7104 (Supp. V 2011)). The contracting officer denied the claim on November 8, 2011. Plaintiff filed its complaint in this court on May 10, 2012.

## DISCUSSION

Count I of the complaint asserts a breach of contract. Plaintiff contends that the contract should be interpreted to require the government to exercise all option years. It relies on the use of the phrase "long-term" to support that construction. To the extent that the court disagrees that the contract's terms explicitly require exercise of all option years, plaintiff contends that the terms should be viewed as ambiguous and open to consideration of extrinsic evidence. According to plaintiff, based on alleged representations of government employees, it was the parties' understanding "that the extension periods would be exercised so long as funding was still available and the Government still required services." Compl. ¶ 44. Plaintiff points to the modification of the contract as evidence of that understanding. *Id.* ¶¶ 48-49.

Count II of the complaint asserts that the failure to exercise the option years was a breach of the covenant of good faith and fair dealing. Plaintiff asserts that the government misled Sundowner through representations about the length of the contract and ICE's participation. The government allegedly

knew plaintiff relied on these representations by exposing itself to third-party leases, and thus the government refused to exercise the options. According to plaintiff, the government acted this way in order to obtain a better price on a new contract and retaliate for the payment made to plaintiff under Amendment/Modification No. M0002.

Defendant moved to dismiss pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims, asserting that, even if taken at face value, the complaint does not state a claim upon which relief can be granted. It argues that the explicit language of the contract controls, and that under this language, the government had unfettered discretion to choose not to exercise the option years.

We agree with defendant that the contract did not require exercise of the option years. Section I Part C, "Options to Extend," is explicit. Each extension was "at the option of the government" and would last for one year or a fraction of a year. Contract § I.C.1. As defendant notes, only specific language will limit this choice. *See Gov't Sys. Advisors, Inc., v. United States*, 847 F.2d 811, 813 (Fed. Cir. 1988) ("An option is normally an option, and nothing . . . limited the circumstances under which the government could decline to exercise that bargained-for right in this case."). There is no such limiting language here.

The contract's reference to itself as "long-term" we view as merely descriptive of the overall contract, assuming all option years are exercised. It certainly creates no ambiguity as to the term "option." Instead, plaintiff's construction of the contract would convert the word into its opposite, an "obligation." As defendant points out, we must read the contract as a whole "so as not to render portions of it meaningless." *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 2006). Generalized descriptions of the contract as "long term" cannot be read in such a way as to eviscerate the very explicit option provisions. *See Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed. Cir. 1992) ("Where specific and general terms are in conflict, those which relate to a particular matter control over the more general language."). Plaintiff points to no other language in the contract which could be construed as nullifying the option language or in any other sense creating ambiguity.[5]

---

[5] We decline to accept plaintiff's suggestion that Section I Part C would
(continued...)

Although the modification is part of the contract, we disagree with plaintiff that it demonstrates an obligation to exercise the option years. Plaintiff suggests that implicit in the USMS' need to modify the contract was an understanding that the original contract obligated the government to exercise all future option years. The modification, according to plaintiff, was a de facto termination for convenience. We disagree; the opposite is implicit. The exercise of the second option and payment for the reduction in aircraft show merely a change in the government's aircraft needs. Plaintiff offers no reason to question the government's legitimate need for only six aircraft. If the parties wanted to maintain an ongoing relationship, one way to do it, rather than terminating for convenience and renegotiating a new contract, was to modify the existing contract by reducing the number of aircraft. The execution of the second option year for eight aircraft while negotiations were ongoing is of no significance. At that time the modification had not yet taken place. If the government had not exercised the second option, the entire contract would have ended.

By its terms, the contract clearly gave the government the option of extending the contract, or not. There is no ambiguity in this respect, and it is therefor unnecessary, and indeed, impermissible to consult extrinsic evidence to "explain" unambiguous terms. The Federal Circuit's ruling under similar circumstances is relevant:

> We find unpersuasive [plaintiff's] argument that the Court of Federal Claims erred by failing to consider other pieces of evidence, including ATC's letter and Mr. Oberta's expert opinion. These documents could be considered evidence of trade practice and custom, which we have found appropriate to consider in some cases even when a contract is unambiguous. However, neither of these documents aids in the interpretation of a term of art in the asbestos abatement field. Rather each document offers an alternate explanation of the contract's abatement standard generally. Under *Hunt Construction*, it is not permissible to use these extrinsic sources to impart

---

[5](...continued)
still have meaning because of Section II.N.2, "Optional Aircraft." That section provides for additional aircraft, if needed, during option years. Nothing in the wording of Section I.C.1 suggests that its use is limited to adding aircraft.

> ambiguity into an otherwise unambiguous contract–they may only be used to interpret a term of art. Given the clarity of the meaning from the language and the parties' pre-contractual negotiations, none of the extrinsic evidence cited by [plaintiff] carries weight.

*Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1340 (Fed. Cir. 2006) (internal citations omitted) (citing *Hunt Const. Group, Inc.*, *v. United States*, 281 F.3d 1369 (Fed Cir. 2002)).

We note, moreover, that to the extent the complaint adverts to extrinsic evidence, the assertions in the complaint concerning representations by government officials as to the duration of the contract are imprecise and do not directly engage the option terms:

> 57. During discussions concerning the reduction from eight aircraft to six, Defendant represented to Sundowner that Defendant had a long-term contract with ICE.
>
> 58. Prior to and during the period of the Contract, Defendant or its agents made representations to Sundowner that ICE was bound to the USMS/JPATS program.
>
> 59. Prior to and during the period of the Contract, Defendant or its agents made representations to Sundowner that ICE's needs and demand for aircraft were substantial and growing.
>
> 60. Prior to and during the period of the Contract, Defendant or its agents made representations to Sundowner that the Contract would last for the full seven-year period.

Compl. ¶¶ 57-60. These allegations are not supported by any details as to which government employees spoke to particular plaintiffs. The times or places are not averred, nor is there any detail as to the particular words used. These are merely generalized assertions, and even if fully credited, are not directly contradictory of the option language. Any representations made prior to executing the contract would, of course, be merged into and controlled by the language of the contract. *See Restatement (Second) of Contracts* § 215 (1981) ("[W]here there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous

9

agreements or negotiations is not admissible in evidence to contradict a term of the writing.").

Plaintiff offers the affidavit of James Flynn, the manager of Sundowner, but his recitations are even less pointed in terms of contractually binding representations. The attached correspondence between the contracting officer and Mr. Flynn is fully consistent with enforcement of the contract as one affording options and no obligation on the part of the agency. We see no support for construing the modification as a termination for convenience. At oral argument, plaintiff's counsel was not able to proffer anything beyond what was in Mr. Flynn's affidavit.

There is no basis, in short, for admitting extrinsic evidence. The terms of the contract are unambiguous, and no special terms of art are employed. *See TEG-Paradigm*, 465 F.3d at 1340. Even if we allow the plaintiff to amend those materials or assertions to its complaint, or converted the motion to dismiss to a motion for summary judgment, it would not alter the outcome. None of the allegations or extrinsic evidence overcome the clarity of the terms of the contract. Count I therefore fails because USMS was not obligated to exercise the option years.

Count II makes the allegation that the agency's conduct violated the contractual duty of good faith and fair dealing. The assumption behind Count II is that USMS was contractually obligated for seven years, irrespective of the option language. Count II thus fails because Count I fails. Because the agency was under no contractual obligation to continue exercising option years, it could not have been bad faith for the agency to end the contract or to reduce the number of aircraft by modification, even if it did so for ill motives or if it obtained a favorable modification by virtue of plaintiff's precarious negotiating posture. The covenant of good faith and fair dealing presumes a contract right in the plaintiff that defendant has thwarted by extra-contractual conduct. *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) ("The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."). Here the government did not interfere with plaintiff's contract rights. It merely exercised its own rights.

CONCLUSION

For the reasons stated above, we grant defendant's motion to dismiss the complaint. The Clerk of Court is directed to dismiss the complaint with prejudice and to enter judgment accordingly. No costs.

                                                  s/ Eric G. Bruggink
                                                  ERIC G. BRUGGINK
                                                  Judge